UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KALLIE FRICKEY, *Plaintiff* v. SURGERY PARTNERS, INC., SP MANAGEMENT SERVICES, INC., SP LOUISIANA, LLC, and PHYSICIANS MEDICAL CENTER, LLC *Defendants* | CIVIL ACTION NO.  22-cv-4062 JURY TRIAL DEMANDED |

## COMPLAINT

Kallie Frickey, by and through undersigned counsel, submits the following Complaint against Defendants Physicians Medical Center, LLC, Surgery Partners, Inc., SP Management Services, Inc., and SP Louisiana, LLC.

### I.    INTRODUCTION

1. Plaintiff Kallie Frickey began working for Defendants in 2013, when she was hired as a Preoperative and Chemotherapy Nurse.

2. Based on her success working for Defendants, Ms. Frickey has been promoted on two separate occasions.

3. In December of 2018, however, Ms. Frickey—along with two other employees—began to uncover significant and widespread billing issues within the Company, which revealed: that Defendants: (A) defrauded its physicians owners and/or the government by underbilling the private insurance companies, thereby overbilling the federal government through the Medicare

program, which was required to cover many of the charges that were supposed to be incurred by the private insurance companies—a practice commonly referred to as "coordinated benefits," and (B) billed for unnecessary services and/or services that were never in fact provided, submitted duplicate claims, and manipulated the coding of bills to seek higher reimbursement rates.

4. After reporting these issues to the Company, including but not limited to Defendants' Chief Executive Officer (CEO), Chief Nursing Officer (CNO), and the Medical Director (MD), and in light of Defendants failure to address these glaring issues in a meaningful and timely fashion, a group of physician owners filed a lawsuit against Defendants in June of 2020.

5. In addition to raising these serious issues, on June 22, 2021, January 13, 2022, and February of 2022, Ms. Frickey reported the sex-based discrimination and/or harassment of herself and one of her female colleagues, Megan Duval, both of whom were falsely accused of attempting to advance their careers by sleeping with Defendants' male physicians.

6. Despite being promised a promotion to the CNO position for which she was qualified, soon after engaging in these protected activities, Ms. Frickey learned that Defendants decided not to award her with this promotion in retaliation for uncovering its unlawful billing practices and/or for raising concerns regarding the Company's discriminatory treatment of both her and Ms. Duval.

7. In an effort to further retaliate against Ms. Frickey and to in attempt to establish a pretextual basis for her termination, Defendants demanded that she be interviewed by Defendants' attorneys on February 22, 2022, March 8, 2022, and June 1, 2022, and that on June 22, 2022 her computer be forensically examined without a legitimate basis for doing so.

8. Soon thereafter, on or around April 18, 2022, Ms. Frickey filed a Charge of Discrimination

with the Equal Employment Opportunity Commission ("EEOC").

9. Since that time, Defendants have forced Ms. Frickey to sit for an additional interview, which took place on June 1, 2022, and is now threatening to terminate her employment if she does not agree to participate in yet another interview.

10. On around October 7, 2022, as a result of the issues described in this Complaint, Ms. Frickey has been advised, and has taken, leave under the Family and Medical Leave Act ("FMLA").

11. Together, this concerted and systemic campaign of retaliation has caused Ms. Frickey significant financial and emotional injuries for which she now seeks redress under Title VII of the Civil Rights Act of 1964, the False Claims Act, and Louisiana's Whistleblower law (R.S. 23:967).

## II. JURISDICTION & VENUE

12. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, the False Claims Act, and Louisiana's Whistleblower law (R.S. 23:967). Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 as Plaintiff's claims arise under federal law.  Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear her claims arising under state law, which arise from a common nucleus of operative facts.

13. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiff's claims arose in the Eastern District of Louisiana, and because Defendants reside and do business in the District.

## III. ADMINISTRATIVE EXHAUSTION

14. Plaintiff filed her Charge of Discrimination on April 18, 2022, against Defendant Physician Medical Center alleging sex discrimination, retaliation, and a hostile work environment.

15. On October 14, 2022, the EEOC issued Plaintiff a Right to Sue Notice and Plaintiff has now

filed this Complaint within 90 days of the receipt of such Notice.

## IV.  PARTIES

*Plaintiff*

16. Plaintiff Kallie Frickey is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. Ms. Frickey, who began working for Defendants in 2013, is still employed by Defendants.

*Defendants*

17. Defendant Physicians Medical Center, L.L.C. ("PMC") is a Louisiana Limited Liability Company, Charter No. 34471393K. It is formerly known as Physicians Surgical Specialty Hospital, LLC, and the Surgical Limited Liability Company. Defendant is managed by Jennifer Baldock and Tom Cowhey. Defendant is domiciled in Houma, Louisiana and operates the hospital Ms. Frickey worked at in Houma, Louisiana ("PMC of Houma"). PMC identifies itself as "A Surgery Partners Company" and is owned by Surgery Partners, Inc. (51% ownership) and individual physicians who provide medical services at PMC of Houma (collectively 49%). The Board of PMC is comprised of three Surgery Partners, Inc. employees, and three physician representatives. During the relevant times in this suit, Scott Chapman, Surgery Partners, Inc. and two other SP employees filled three of the six spots on the PMC Board. PMC pays a monthly management fee to SP Management Services, Inc. to provide hospital, patient, certification, evaluation, and staff management services to PMC. PMC employees, including the highest levels of leadership, were supervised by Surgery Partners Inc. employees, including the head of Human Resources, CEO, CFO, and CNO. PMC's benefits policies list PMC as Ms. Frickey's employer, says that PMC provides and pays for her benefits, and tells her to go to

PMC Human Resources with benefits questions.

18. Defendant Surgery Partners, Inc. is a corporation incorporated in Delaware, based in Tennessee, and operating in part in Louisiana. It is an operator of surgical facilities and ancillary services with more than 180 locations nationwide, including operations at the hospital operated by Physicians Medical Center, LLC in Houma, Louisiana where they manage Louisiana employees and provide services for Louisiana patients. Its Louisiana charter number is 42033553F. Defendant is managed by Jennifer Baldock, Tom Cowhey, Brett Kennedy, Dave Doherty, and Jeff O'Brien. Surgery Partners Inc. provides all employees, funds and resources to PMC to fulfill the management services that SP Management Services, Inc. is paid to perform. Surgery Partners, Inc. provides PMC with human resources services, a shared payment processing system for staff wages, email management for staff (including use of an @surgerypartners.com address), benefits and time off, supervision and oversight of PMC employees (including the Chief Executive Officer, Chief Nursing Officer, Human Resources, and other leadership), recruits new hires, manages the PMC website and provides content and photography to match the Surgery Partners, Inc. website, reviews determinations regarding compensation, requests for promotion, assignment of job duties, leave requests, among other personnel decisions.

19. Defendant SP Management Services, Inc. is a Tennessee corporation authorized to do and doing business in Louisiana, including operations at the hospital operated by Physicians Medical Center, LLC in Houma, Louisiana where they manage Louisiana employees and provide services for Louisiana patients. Their registered office and principal business establishment in Louisiana at 501 Louisiana Avenue, Baton Rouge, LA 70802. Defendant is managed by Jennifer Baldock, Tom Cowhey, Brett Kennedy, Dave Doherty, and Jeff O'Brien.

SP Management receives hundreds of thousands of dollars from PMC each month to provide management services to PMC and provides these funds to Surgery Partners, Inc. Ms. Frickey's paystubs show her benefits come from SP Management Services, Inc. Upon information and belief, SP Management Services Inc is owned by Surgery Partners, Inc.

20. Defendant SP Louisiana, LLC, is a Louisiana company domiciled at 501 Louisiana Avenue, Baton Rouge, LA 70802. SP has annual revenues in excess of a billion dollars. Defendant is managed by Jennifer Baldock and Tom Cowhey. Upon information and belief, SP Louisiana LLC is owned by Surgery Partners, Inc.

21. Together, Surgery Partners, Inc., SP Management Services, Inc., and SP Louisiana, LLC, are referred to as "SP." Together SP and PMC are the "Defendants." The Defendants were jointly Ms. Frickey's employer.

## V.  STATEMENT OF FACTS

*Ms. Frickey Excelled as an Employee of Defendants.*

22. With several years of experience as a nurse, Ms. Frickey applied to work for Defendants in or around December of 2012.

23. After reviewing her application and interviewing her, Defendants decided to hire Ms. Frickey as Preoperative and Chemotherapy Nurse—a position she began in January of 2013 in Houma, Louisiana.

24. As a result of her success in this position, Ms. Frickey was promoted to the position of Recovery Room Supervisor in June of 2014.

25. From June of 2014 to June of 2020, when she was promoted to the position of Director of Perioperative Services and Assistant Chief Nursing Officer, Ms. Frickey received excellent performance reviews and was never disciplined by Defendants.

*Ms. Frickey and Her Colleagues Uncovered Systemic Billing Issues That Violated the Law.*

26. In December of 2018, while working for Defendants as a Recovery Room Supervisor, Ms. Frickey—alongside her colleagues Megan Duval and Serena Ledet—was assigned by then-CEO Ben Patterson and governing board members to look at the costs and revenues for spine and orthopedic implants in light of the fact that Defendants were losing a significant amount of money and wanted to determine the cause.

27. Soon after Ms. Frickey and her colleagues began reviewing previous patient procedures and/or surgeries, they noticed a host of different billing issues where Defendants failed to properly and accurately bill patients for the care it provided.

28. Upon learning this information, Ms. Frickey and her colleagues reported their findings to senior level administrators, including but not limited to the CEO, the CNO, and the MD, who in turn reported to SP's Corporate Officers.

29. Notably, Ms. Frickey and her colleagues' findings clearly indicated that Defendants were *underbilling* the private insurance companies and thereby *overbilling* the federal government through the Medicare program, which was required to cover many of the charges that were supposed to be incurred by the private insurance companies—a practice commonly referred to as "coordinated benefits."

30. Additionally, Mr. Frickey and her colleagues' findings revealed that Defendants were billing for unnecessary services and/or services that were never in fact provided (e.g., billing for Omidria on eye patients when it wasn't being used or billing for four total knee implants when

only one used in the case), submitting duplicate claims, and manipulating the coding of bills in order to be able to seek higher reimbursements.

31. In June of 2019, as a result of these findings, Defendants made significant changes to its administrators and corporate officers, hiring a new CEO, Chief Financial Officer ("CFO"), Regional Vice President, and Vice President of Operations.

32. While the newly hired administrators initially halted Ms. Frickey and her colleague's investigation, they were allowed to resume their investigation in August of 2019.

33. After resuming their investigation, Mr. Frickey and her colleagues discovered that the billing failures were not limited to orthopedic cases, but rather involved a wide variety of procedures and/or surgeries.

34. From August of 2019 to January of 2020, Mr. Frickey and her colleagues continued to press forward with their investigation, uncovering an increasing number of issues as time progressed.

35. In January of 2020, Defendants had an external and independent firm conduct a coding audit, which confirmed Ms. Frickey and her colleagues' findings.

36. In or around April of 2020, Ms. Ledet terminated her employment with Defendants.

37. As a result of her departure, Ms. Duval tasked employee Anna Plaisance with assuming Ms. Ledet's role in the investigation.

38. This, however, was not the first time that Surgery Partners and/or one of its subsidiaries had been credibly accused of fraudulently billing the government, as it was named in two different interrelated lawsuits in 2016 and 2017 which together resulted in a 41-million-dollar settlement in April of 2020. *See Ashton v. Logan Laboratories, LLC et al.*, Case No. 16-4583 (E.D. Pa.); *United States ex rel. Cho v. Surgery Partners Inc., et al.*, Case No. 8:17-cv-983 (M.D. Fla.);

https://www.justice.gov/opa/pr/reference-laboratory-pain-clinic-and-two-individuals-agree-pay-41-million-resolve-allegations.

39. On June 19, 2020, Ms. Frickey was promoted to the position of Director of Perioperative Services & Assistant Chief Nursing Office. Despite being promised a raise for this promotion, no such raise was ever provided.

40. Upon information and belief, Ms. Frickey was not provided with this raise in retaliation for engaging in protected activity under both state and federal law.

41. In June of 2020, partially as a result of Ms. Frickey and her colleagues' findings, several physician owners initiated a lawsuit against Defendants. *See Schwab et al. v. Surgery Partners, Inc., et al.*, 32nd JDC Case No. 188889.

***Ms. Frickey Was Promised a Pay Raise and a Promotion to the CNO Position.***

42. In January of 2021, Mr. Knizley promised Ms. Frickey that she would receive a raise in her then-current position.

43. In May of 2021, Mr. Knizley also promised Ms. Frickey that she would be promoted to position of CNO, further indicating that everyone wanted her to take on this position and that she would be a "great fit."

44. At this time, Mr. Knizley was aware that Ms. Frickey did not yet have her master's degree—the absence of which he indicated would not pose any issues to her landing the CNO position.

45. Upon information and belief, other similarly situated male CNOs within SP were allowed to be hired without a master's degree.

***Ms. Frickey Submits Complaints Regarding the Sex Discrimination that She and Ms. Duval Were Being Forced to Endure.***

46. On or around June 18, 2021, Ms. Frickey's colleague—Shayla Washington—informed Ms. Frickey that Defendants' Business Office Manager, Jeanne Olivier, was telling numerous

business office employees that Ms. Duval was sleeping with physicians in order to advance her career.

47. Just three days later, on June 21, 2021, Defendants' employee Lesley Sanchez, also communicated this information to Ms. Frickey, thereby indicating that this information had permeated the office.

48. On June 22, 2021, Ms. Frickey emailed Vice President Scott Chapman, as well as Board Members Dr. Brett Casey, Dr. Guy Zerigue, and Mr. Knizley, where she, in part, detailed the sexual harassment and/or discrimination that Ms. Duval was being subject to, as well as the retaliation she had been forced to endure since uncovering Defendants' widespread billing issues.

49. On July 16, 2021, Defendants' employee Karen Fairchild, called Ms. Frickey to inform her that Defendants' supervisory level employees—Ms. Olivier, Robert Bland, and Lynette Martin—were spreading defamatory rumors concerning Ms. Duval and Ms. Frickey, maliciously alleging that they were both sleeping with physicians to advance their careers.

50. Additionally, Ms. Fairchild informed Ms. Frickey that some and/or all of these employees had disparagingly and falsely been claiming she and Ms. Duval were illegally writing prescriptions using signature stamps and that Ms. Duval's back "must hurt from sleeping with so many doctors."

51. Separately, Ms. Plaisance informed Ms. Frickey that Ms. Bourg—an ally of Mr. Knizley—had been falsely telling her colleagues that Ms. Frickey was stealing narcotics.

52. In or around July 26, 2021, Defendants settled the ongoing litigation in *Schwab et al. v. Surgery Partners, Inc., et al.*, requiring Defendants to pay the plaintiffs in that matter millions of dollars.

***Mr. Knizley Refused to Promote Ms. Frickey to the CNO Position in Retaliation for Engaging in Protected Conduct.***

53. From August to November of 2021, the Hospital was closed for repairs due to damage it sustained during Hurricane Ida.

54. Upon returning to the Hospital in November of 2021, Mr. Knizley began to retaliate against Ms. Frickey, seeking to undermine her authority and portray her in a negative light.

55. For example, Mr. Knizley reversed several disciplinary actions taken by Ms. Frickey against one of her subordinate employees, Alisa Bourg, and did so with no legitimate or rational basis.

56. Similarly, Mr. Knizley intentionally prohibited Ms. Frickey from ordering and procuring necessary medical supplies. When Ms. Frickey complained about this issue to Dr. Donald Schwab, Dr. Schwab erroneously blamed her for the issue, citing fact that according to Mr. Knizley, she was trying to "sabotage" the reopening of the Hospital—a patently false statement made by Mr. Knizley in an effort to retaliate against Ms. Frickey and ostracize Ms. Frickey from her peers.

57. Finally, on or around December 13, 2021, Mr. Knizley hired a clinical consultant, which Ms. Frickey later learned from one of the physicians was hired to develop pretextual reasons to terminate her employment.

58. From December 13, 2021, through mid-January of 2022, the consultant regularly attempted to instigate issues in order to provoke Ms. Frickey from engaging in conduct that could serve as the basis for her termination and further ostracize Ms. Frickey from her peers.

59. In light of this incessant retaliation and harassment, and the fact that her June 22, 2021, complaint had not been adequately addressed, Ms. Frickey spoke with SP's CNO Patricia Hannon on January 13, 2022.

60. During Ms. Frickey's conversation with Ms. Hannon, Ms. Frickey complained about the retaliation she was facing and also reiterated concerns that Ms. Duval was being discriminated against on the basis of her sex.

61. On January 24, 2022, the Interim CNO, Genie Woodring, informed Ms. Frickey that she would no longer serve as the Director of the Operating Room ("OR") and would no longer serve in the position of Assistant Chief Nursing Officer.

62. Together these changes, represented a significant reduction in Ms. Frickey's responsibilities and authority, and were contrary to the reporting structure that had been in place in 2015 which was imposed in accordance with state law.

63. Additionally, on January 24, 2022, Ms. Plaisance informed Ms. Frickey that Mr. Knizley and Ms. Olivier had communicated to her that Ms. Frickey would never be the CNO after submitting her complaint on June 22, 2021.

64. On February 11, 2022, Ms. Frickey submitted an additional written complaint to Scott Chapman and Human Resources Director Tara Pellegrin where she reiterated her complaints about the sexual harassment of Ms. Duval and detailed the various ways that she has been retaliated since making that complaints, including but not limited to being accused of possessing physician signature stamps, having her office searched without her knowledge or consent, and Mr. Knizley's refusal to respond to her emails and phone calls.

65. This retaliation culminated on April 18, 2022, when Ms. Frickey was officially informed that she was not going to be promoted to the CNO position as they had allegedly found someone

who was more qualified; however, the individual who was selected for this position, Tyra Newcomb, has significantly less experience than Ms. Frickey.

*Defendants Continue to Retaliate Against Ms. Frickey.*

66. On or around February 17, 2022, Ms. Plaisance informed Ms. Frickey that Defendants were conducting an investigation and/or audit of Ms. Frickey and others for engaging in fraudulent activities.

67. Audio recordings with Ms. Plaisance and Brittany Sonnier, among others, as well as the "audit criteria" to be used to frame Ms. Frickey and Ms. Duval, further corroborate these allegations.

68. According to Ms. Plaisance, Mr. Knizley met with her in January of 2022 in attempt to have her participate in a scheme to fabricate allegations of fraud against Ms. Frickey—all of which was a larger effort to destroy Ms. Frickey's reputation and ultimately cause her to quit.

69. Furthermore, Ms. Plaisance stated that Mr. Knizley had expressed that he sought to "ruin" Ms. Frickey "professionally and financially."

70. Since February of 2022, Ms. Frickey has been forced to sit for three different interviews with Defendants' counsel—each which lasted approximately two hours—to question her regarding these fabricated allegations of fraud, among other subjects.

71. Ms. Frickey was even forced to allow Defendants to forensically examine her computer and produce numerous documents—all of which was done to harass and retaliate against Ms. Frickey for engaging in statutorily protected conduct.

72. Further, on April 28, 2022, Ms. Frickey's access to the billing system was removed from without notice.

73. Despite submitting a complaint regarding this retaliatory act, to Sandra Vincent, Ms. Pellegring, and Mr. Chapman, Defendants never followed up with Ms. Frickey and have never provided an explanation for this adverse action.

74. Most recently, on August 27, 2022, Defendants demanded that Ms. Frickey sit for yet another interview regarding its fabricated allegations of fraud, further insinuating that her employment would be in jeopardy if she did not comply with its demands.

75. As a result of Defendants' conduct, on around October 7, 2022, after careful consultation and consideration with her healthcare providers, Ms. Frickey requested FMLA leave.

## VI. CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**Retaliation in Violation of the False Claims Act**
**31 U.S.C. § 3730(h)**
*As Against All Defendants*

76. Ms. Frickey hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

77. The False Claims Act ("FCA") makes it illegal to knowingly present to the federal government a false or fraudulent claim for payment. To encourage those with knowledge of such fraud to come forward, the FCA contains a whistleblower provision which provides a cause of action for employees who experience adverse employment actions because they have made efforts to stop one or more of such violations. *See Musser v. Paul Quinn Coll.*, 944 F,3d 557, 560 (5th Cir. 2019).

78. Under the FCA, a whistleblower is not required to file a lawsuit against her employer to receive protection under the law; rather, the employee's protected activity need only be related to matters that "could reasonably lead to a viable claim under the Act." *Gartman v. Hous. Auth. of Jefferson Par.*, No. 17-12375, 2018 U.S. Dist. LEXIS 28513, at *7 (E.D. La. Feb. 22, 2018).

79. Here, Ms. Frickey internally reported to Defendants' that it was often fraudulently billing the government for care that it rendered or alleged that it rendered—allegations that she reasonably and in good faith believed to be true.

80. Not only was this the result of Defendants' failure to properly bill the private insurance companies, but also took the form of billing for unnecessary services, billing for services not provided, duplicate claims, and undercoding inpatient claims which resulted in improper Cost Outlier Payments.

81. In response to this statutorily protected activity, Mr. Knizley and others began a campaign of retaliation against Ms. Frickey, which continues to persist and which includes refusing to promote her to the CNO position, significantly altering her roles and responsibilities as an employee, denying her the raise she was promised when she was promoted to the position of Director of Perioperative Services & Assistant Chief Nursing Office in June of 2020, and initiating a pretextual investigation into her related to allegations that she was committing fraud.

82. The retaliation against Ms. Frickey can be corroborated by a wider pattern of retaliation engaged in by Defendants, including but not limited to the retaliation alleged by Megan Duval in a pending federal lawsuit. *See Duval v. Physicians Medical Center, LLC et al.*, 2:2022-cv-02286 (E.D.L.A. 2022).

83. In addition to Ms. Duval, Defendants also retaliated against employee Lesley Sanchez, who was fired shortly after filing a complaint against Mr. Knizley and other supervisory level employees. After Ms. Sanchez was terminated, employee, it was revealed that Mr. Knizley forced another employee, Brittney Sonnier, to file a fabricated complaint against Ms. Sanchez to justify her otherwise unlawful and retaliatory termination.

84. This very same type of retaliation was also recounted by employee Anna Plaisance who swore that she is "in fear of retaliation by Andrew Knizley and Surgery Partners" and that she was "fearful that Andrew will discuss my complaint with these employees and they will retaliate against me making it impossible for me to continue a working relationship with these individuals which is essential in order for me to perform my job." Ms. Plaisance currently has a pending federal lawsuit against Defendants, alleging that Defendants retaliated against her in violation of the FCA.

85. This pattern of retaliation was apparent to Defendants' minority shareholders who alleged in their lawsuit against Defendants that Defendants had been "retaliating against Members and [its] own staff, both medical and non-medical, who learned of and pointed out" problems.

86. The adverse actions taken against Ms. Frickey were taken in retaliation for engaging in protected conduct under the FCA.

87. As a direct and proximate cause of Defendants' retaliation, Ms. Frickey has suffered significant pecuniary and emotional damages.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. §2000e**
*Against All Defendants*

88. Ms. Frickey hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

89. Title VII's antiretaliation provision "prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 576-77 (5th Cir. 2020)

90. Here, Ms. Frickey engaged in protected activity when she reported the sexual harassment of both her and her colleague, Megan Duval, as well when she complained of the retaliation she faced for engaging this protected conduct.

91. Defendants retaliated against Ms. Frickey because of her protected activities when it failed to promote her to the CNO position, removed significant duties and responsibilities from her purview, and harassed her by interviewing her on multiple occasions making her a target of Defendants, instead of investigating the violations of law she and others complained of, including forensically examining her computer and demanding that she be interrogated by Defendants' attorneys regarding fabricated allegations of fraud while threatening her job security if she did not agree to be interrogated while those same claims, facts, and circumstances were pending at the EEOC.

92. By doing so, Defendants engaged in conduct materially adverse to a reasonable employee and therefore took adverse employment actions against Ms. Frickey.

93. Defendants took these actions because Ms. Frickey engaged in protected conduct, and such actions were motivated by retaliatory animus.

94. Defendants are liable for the act and/or omissions of its agents and employees.

95. As a direct and proximate cause of Defendants' retaliation, Ms. Frickey has suffered significant pecuniary and emotional damages.

### THIRD CAUSE OF ACTION
### Retaliation in Violation of Louisiana's Whistleblower Law (R.S. 23:967)
*As Against All Defendants*

96. Ms. Frickey hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

97. Louisiana's Whistleblower Law (R.S. 23:967) protects employees against reprisal when they

disclose any "workplace act or practice that is in violation of state law."

98. Here, Ms. Frickey reported to Defendants that Defendants were violating state law including but not La R.S. 14:70.1 and/or La. C.C. 1953 for engaging in fraud, and a deceptive trade practice in violation of La.RS 51:1405(A).

99. Upon information and belief, Ms. Frickey's protected activity included reporting actual violations of state law.

100. As a result of this protected conduct, Ms. Frickey was subjected to adverse employment actions, including but not limited to failing to promote her to the CNO position, removing significant duties and responsibilities from her purview, and initiating a pretextual investigation into her related to allegations that she was committing fraud.

101. Defendants engaged in conduct materially adverse to a reasonable employee and therefore took adverse employment actions against Ms. Frickey

102. Defendants took these actions because Ms. Frickey engaged in protected conduct, and such actions were motivated by retaliatory animus.

103. Defendants are liable for the act and/or omissions of its agents and employees.

104. As a direct and proximate cause of Defendants' retaliation, Ms. Frickey has suffered significant pecuniary and emotional damages.

### VII.    RELIEF REQUESTED

105. Wherefore Plaintiff prays for judgment against Defendants as follows:

   (a) For a judgment against Defendants for all asserted causes of action;

   (b) For a judgment awarding compensatory and special damages;

   (c) For judgment awarding front pay;

   (d) For judgment awarding back-pay;

    (e)  For judgment awarding double back-pay under the False Claims Act.

    (f)  For a judgment awarding Plaintiff her costs and attorney's fees;

    (g)  Punitive Damages;

    (h)  For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law; and

    (i)  For all other and further relief as may be necessary and appropriate.

106. Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and request any and all other damages or remedies which this Court may seem equitable.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

                                                                             /s/ Kenneth C. Bordes
                                                       **Kenneth C. Bordes (Bar #35668)**
                                                       **KENNETH C. BORDES,**
                                                       **ATTORNEY AT LAW, LLC**
                                                       4224 CANAL ST.
                                                       NEW ORLEANS, LA 70119
                                                       P: 504-588-2700
                                                       F: 504-708-1717
                                                       E: kcb@kennethbordes.com

                                                       *Attorney for Plaintiff, Kallie Frickey*